# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Marlon Rashaad Robertson,<br><br>                      Petitioner,<br><br>v.<br><br>Eddie Miles,<br><br>                      Respondent. | Case No. 17-cv-4277 (JRT/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

Marlon Rashaad Robertson has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Doc. No. 1]. For the reasons set forth below, the Court recommends that the petition be denied.

## I.      Background

Robertson is serving a sentence of life imprisonment without the possibility of release. (Pet. at 1 [Doc. No. 1].)[1] He was convicted by a jury of one count of first-degree premeditated murder, two counts of attempted first-degree felony murder, three counts of attempted second-degree intentional murder, one count of second-degree assault, and one count of first-degree aggravated tampering with a witness. (Pet. at 1-2.) Robertson appealed his conviction and sentence to the Minnesota Supreme Court, which affirmed.

---

[1] For all documents in the record, the Court cites to the pages numbers designated by the CM/ECF system, which are located in the upper right corner of each page. For some documents of record, the Court will also cite to the page number on the original document.

*State v. Robertson*, 884 N.W.2d 864, 867 (Minn. 2016). Robertson also filed a postconviction petition challenging his trial counsel's effectiveness, which was denied. (Pet. at 6.)

The facts relevant to the murder conviction were summarized by the Minnesota Supreme Court as follows. Kevin Braziel was shot and killed on June 24, 2013. *Robertson*, 884 N.W.2d at 867. About two months before the murder, in April 2013, Braziel's friend M.S. was the victim of a robbery. *Id.* M.S. told police that Robertson was present at the scene but did not actively participate in the robbery. *Id.* Robertson later told M.S. in a Facebook message, "It's crazy how y[o]u turn[ed] on me." *Id.* M.S. responded by accusing Robertson of setting up the robbery, and Robertson messaged another friend that M.S. was a snitch and responsible for the incarceration of a friend. *Id.*

Braziel was shot while he was talking to M.S. and another person in a parking lot. *Id.* An individual identified as "S.L." was nearby, sitting in her car with the door open in a parking lot, when the shooting occurred. *Id.* Moments before the shooting, S.L. saw "a young adult black male with a dark complexion, of average height (5'8 to 5'10) and average build," wearing a white shirt and tan jeans, walk by her car, but she noticed him mainly for his distinctive footwear, a pair of Timberland boots that were "autumn color." *Id.* at 868. A few seconds later, S.L. heard gunshots and saw shell casings fly through the air. *Id.* The man with the autumn Timberland boots ran back by her car with his hand

2

tucked under his shirt, as though he were hiding something.  *Id.*  Security camera footage from a business revealed a man in a white shirt running away from the scene.  *Id.*  M.S. later told the police he believed that he was the target of the shooting, not Braziel.  *Id.*

The day after the shooting, Robertson posted on his Facebook page, "Lmfao . . . they must forgot solo was on they ass!!!!free my hittas."  *Id.*  Robertson's street name was "Solo," and two of his alleged gang associates remained in jail for the April robbery of M.S.  *Id.* at 868-69.  A day or two later, Robertson sold the gun used in the shooting and told the buyer he knew it worked because he had recently shot it.  *Id.* at 869.  Four days after the shooting, S.L. was presented with a photo lineup of six individuals, and she set aside two photos for further review.  *Id.*  One of the photos was Robertson, but S.L. eventually identified the other person, R.E., as the shooter.  *Id.*

Police discovered a pair of autumn-colored Timberland boots at Robertson's home during the execution of a search warrant on July 31, 2013.  *Id.*  Investigators also found a Facebook profile photo in which Robertson was wearing the boots.  *Id.*  Robertson admitted the boots were his during a subsequent police interview.  *Id.*  He also admitted on a recorded phone call from jail that the police had mentioned his shoes and his description in a criminal complaint.  *Id.* at 871.

Robertson was arrested and charged with the first-degree premeditated murder of Braziel and with seven other related crimes.  *Id.* at 870.  He did not testify at trial or present any witness testimony.  *Id.*  Robertson's theory of defense was that he and M.S.

3

were friends and that another person was the shooter. *Id.*

Robertson asserts the following grounds for relief in his habeas petition: (1) ineffective assistance of trial counsel; (2) sentencing error; (3) the definition of "reasonable doubt" provided to the jury; (4) erroneous evidentiary rulings; (5) an unduly suggestive photo lineup; and (6) prosecutorial misconduct. (Pet. at 5-12.) He also argues in his supporting memorandum that the evidence at trial was not sufficient to sustain the murder conviction, but he did not make that argument in the habeas petition itself. (Pet'r's Mem. at 9 [Doc. No. 2].)

## II.    Discussion

Habeas relief under 28 U.S.C. § 2254 may be warranted in three circumstances: (1) when a state court decision was contrary to clearly established federal law, (2) when a state court decision involved an unreasonable application of clearly established federal law, or (3) when a state court decision "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (2). Typically, a court may not grant a petition unless the petitioner has first exhausted all state court remedies. 28 U.S.C. § 2254(b)(1)(A). If a petitioner "has the right under the law of the State to raise, by any available procedure, the question presented," the claim is not exhausted. 28 U.S.C. § 2254(c). On the other hand, a court may deny a petition on the merits even if the petitioner has not exhausted all state court remedies. 28 U.S.C. § 2254(b)(2). A state may expressly waive the exhaustion requirement. 28 U.S.C.

4

§ 2254(b)(3).

The United States Supreme Court discussed the meaning of the "contrary to" and "unreasonable application" clauses of § 2254(d) in *Williams v. Taylor*, 529 U.S. 362 (2000). A state court decision is "contrary to" the Supreme Court's precedent if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or if it "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 405. A state court decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The habeas court must "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. A federal court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

In addition, when reviewing a state court decision, a federal habeas court "presumes that the state court's factual determinations are correct." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)). This deference applies to factual determinations made by the state trial and appellate courts. *Sumner v. Mata*, 449 U.S. 539, 547 (1981). The petitioner has "the burden of rebutting the presumption of

correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Whitehead v. Dormire*, 340 F.3d 532, 539 (8th Cir. 2003).

### A.    Ineffective Assistance of Trial Counsel

Robertson argues that his trial counsel was ineffective because he failed to interview M.S. as a potential witness and did not obtain Robertson's consent for the court to give a jury instruction concerning his right not to testify.

The right to the effective assistance of counsel in a criminal case arises from the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). To prevail on a claim of ineffective assistance of counsel, a claimant must show that (1) his counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for his counsel's errors, the outcome of the proceeding would have been different. *Id.* at 687-88, 694. "The first prong requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *White v. Dingle*, 757 F.3d 750, 752 (8th Cir. 2014) (quotation and internal quotation marks omitted). In assessing the first prong, the Court's review of counsel's performance "is highly deferential," *Camacho v. Kelley*, 888 F.3d 389, 394 (8th Cir. 2018), and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689 (*quoted in Camacho*, 888 F.3d at 394). The second prong requires a strong showing of prejudice:

6

essentially, that counsel's performance was so deficient that it deprived the defendant of a fair trial. *Booth v. Kelley*, 882 F.3d 759, 762 (8th Cir. 2018) (quoting *Strickland*, 466 U.S. at 687). Robertson bears the burden of establishing both prongs. *See Strickland*, 466 U.S. at 687; *Thomas v. United States*, 737 F.3d 1202, 1207 (8th Cir. 2013). "Failure to establish either *Strickland* prong is fatal to an ineffective-assistance claim." *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011).

The Minnesota Supreme Court remarked that counsel's failure to interview M.S. or call M.S. as a witness was a matter of trial strategy that was essentially unreviewable. *Robertson*, 884 N.W.2d at 877. This is consistent with *Strickland*'s guidance that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. The Minnesota Supreme Court also determined that even if Robertson had met the first *Strickland* prong, he had not established that his counsel's performance was prejudicial. *Robertson*, 884 N.W.2d at 877. Prejudice was absent "because the testimony Robertson claims M.S. would have provided was elicited at trial through other evidence." *Id.* The Court finds the Minnesota Supreme Court decision was neither contrary to nor an unreasonable application of *Strickland*.

Turning to Robertson's claim that his attorney failed to object to the court's jury instruction concerning his right not to testify, Robertson has not identified a Supreme Court case holding that an attorney's failure to obtain a defendant's express consent to a

no-adverse-inference jury instruction is objectively unreasonable.  Moreover, an attorney's decision to submit a no-adverse-inference instruction to the jury is a matter of trial strategy that is virtually unreviewable in a habeas proceeding.  *See Davis v. Grandlienard*, No. 13-cv-2449 (DSD/JJK), 2015 WL 1522186, at *20 (D. Minn. Mar. 31, 2015) (finding it "extremely doubtful that Davis suffered any harm as a result of the no-adverse-inference instruction," but in any event, concluding "the Minnesota Supreme Court's decision that Davis was not prejudiced by the no-adverse-inference instruction was not an unreasonable application of constitutional law to the facts of this case"), *aff'd*, 828 F.3d 658 (8th Cir. 2016).

As to the second prong, Robertson has not shown that his lawyer's failure to obtain his consent to the instruction was so reckless that it deprived him of a fair trial or that the outcome of the trial would have been different if the no-adverse-inference instruction had not been submitted to the jury.  Consequently, Robertson should not be granted habeas relief on his ineffective-assistance claim.

## B.    Robertson's Sentence

Robertson raises two grounds for habeas relief with respect to his sentence.  First, he contends that the sentencing court incorrectly used his instant conviction to enhance his sentence, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004), and due process.  Robertson raised this argument in his pro se supplemental brief to the Minnesota Supreme Court.  (Resp't's App. at 1408 (Appellant's Pro Se Suppl. Br. at 34)

8

[Doc. No. 19].)

Robertson was convicted of murder in the first degree under Minn. Stat.

§ 609.185(a)(1). That statute, by its terms, provides for a sentence of "imprisonment for

life" for an offense of premeditated murder in the first degree. *Id.* In addition, an

individual may be sentenced to imprisonment for life *without release* in three

circumstances:

> (1) the person is convicted of first-degree murder under section 609.185, paragraph (a), clause (1), (2), (4), or (7);
>
> (2) the person is convicted of committing first-degree murder in the course of a kidnapping under section 609.185, paragraph (a), clause (3); or
>
> (3) the person is convicted of first-degree murder under section 609.185, paragraph (a), clause (3), (5), or (6), and the court determines on the record at the time of sentencing that the person has one or more previous convictions for a heinous crime.

Minn. Stat. § 609.106, subd. 2.

Robertson's *Blakely* argument likely arises from a misperception that he was

sentenced to imprisonment for life without release pursuant to Minn. Stat. § 609.106,

subd. 2(3), which requires a court to determine that the defendant "has one or more

previous convictions for a heinous crime." But Robertson was sentenced pursuant to

Minn. Stat. § 609.106, subd. 2(1), which provides for a sentence of imprisonment for life

without release when a defendant is convicted of premeditated murder in the first degree

under Minn. Stat. § 609.185(a)(1). *See* Minn. Stat. § 609.106, subd. 2(1). During the

sentencing phase of Robertson's trial, the State asked the court to impose a sentence for

9

Count 1—premeditated murder in the first degree—and that was the sentence the court imposed.  (Resp't's App. at 1244-46 (Trial Tr. at 1227).)

Robertson's second challenge to his sentence is that it violates the Eighth Amendment's prohibition against cruel and unusual punishment and *Miller v. Alabama*, 567 U.S. 460 (2012).  In *Miller*, the Court held that a mandatory sentence of life without the possibility of release for an offender who was under the age of eighteen at the time of the crime was cruel and unusual punishment in violation of the Eighth Amendment.  *Id.* at 465.  Robertson argues that he should have been sentenced as a juvenile because even though he was twenty-two years old at the time of the shooting, he was not actually a mature and responsible adult.

Robertson made this argument to the Minnesota Supreme Court, which held that *Miller* did not apply to Robertson because he was not a juvenile at the time of the shooting.  *Robertson*, 884 N.W.2d at 877 (citing *Munt v. State*, 880 N.W.2d 379, 383 (Minn. 2016), for its holding that *Miller* is strictly limited to juveniles and that limiting *Miller* in this way does not violate the Equal Protection Clause).  Robertson has identified no clearly established federal law that is contrary to the Minnesota Supreme Court's decision or that would support a finding that the court applied *Miller* unreasonably.  Nor has Robertson identified any authority that would support his position that an offender over the age of eighteen should be afforded the Eighth Amendment protections articulated in *Miller* because the individual is immature or irresponsible.  *Cf. United*

10

*States v. Marshall*, 736 F.3d 492, 500 (6th Cir. 2013) (stating that the defendant "is at the very most an immature adult. An immature adult is not a juvenile. Regardless of the source of the immaturity, an immature adult is still an adult" and finding that because the defendant "is not a juvenile, he does not qualify for the Eighth Amendment protections accorded to juveniles" under *Miller*).

### C.    Jury Instructions

Robertson argues the trial court's instructions about reasonable doubt and juror unanimity violated due process. The Minnesota Supreme Court summarily concluded these arguments lacked merit. *State v. Robertson*, 884 N.W.2d 864, 877 (Minn. 2016).

### 1.    "Reasonable-Doubt" Instruction

As part of the instructions on reasonable doubt, the court told the jury:

> [T]he law requires the State to prove the elements of each of the offenses beyond a reasonable doubt. It does not require that the elements be proved beyond all possibility of doubt, nor does it require that the elements be proved to a mathematical certainty.
> Proof beyond a reasonable doubt is that amount of proof which ordinary men and women rely upon in making their own most important decisions. So you have a reasonable doubt if your doubts are based upon reason and common sense. You do not have a reasonable doubt if your doubts are based upon speculation or irrelevant details.

(Resp't's App. at 1103 (Trial Tr. at 1086).) Robertson takes issue with the court's use of the terms "speculation," "irrelevant details," and "mathematical certainty." He contends these terms caused him "to be convicted under a less stringent standard that that required by due process." (Pet'r's Mem. at 19.)

11

The Supreme Court has instructed that the "beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).  As long as the court instructs the jury that the government must prove the defendant's guilt beyond a reasonable doubt, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.*

Robertson cites two Supreme Court cases in support of his position.  In *Cage v. Louisiana*, 498 U.S. 39 (1990), which was *overruled by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991), the Court considered a jury instruction that read, in relevant part:

> If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty.  Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused.  This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture.  It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.  A reasonable doubt is not a mere possible doubt.  It is an actual substantial doubt.  It is a doubt that a reasonable man can seriously entertain.  What is required is not an absolute or mathematical certainty, but a moral certainty.

*Id.* at 40.  The Court held that the trial court's use of the terms "actual substantial doubt" and "grave uncertainty," and admonition to jurors that they must have a "moral certainty" of guilt, could have been interpreted by the jury as imposing a lower standard of proof than that required by due process.  *Id.* at 41.  In *Boyde v. California*, 494 U.S. 370 (1990),

12

the Court held that an instruction to the jury that it "shall impose" a death sentence upon making certain findings did not violate the Constitution. 494 U.S. at 377.

Viewing the instruction at issue in its entirety, the Court finds that the trial court's inclusion of the words "speculation," "irrelevant details," and "mathematical certainty" in the jury instruction did not dilute the reasonable doubt standard so as to violate due process. These terms are not the same as or comparable to those denounced in *Cage* or *Boyde*. To the contrary, the term "mathematical certainty" was included in the *Cage* instruction but apparently neither challenged nor addressed. Similarly, the term "speculation" is comparable to "conjecture" in the *Cage* instruction," and basing a doubt on "irrelevant details" would be comparable to not having "a real tangible substantial basis" for a doubt, also terms that were not challenged or addressed in *Cage*. Finally, *Cage* is no longer good law, having been overruled by *Estelle*.

In sum, the Court has reviewed the reasonable-doubt instruction given during Robertson's trial and concludes that it did not violate due process under clearly established federal law.

### 2.    "Unanimous Verdict" Instruction

Robertson argues that the trial court's instruction to the jury that its verdict must be unanimous deprived him of due process because it had a coercive effect to render a guilty verdict. The court instructed the jury that "in order for you to return a verdict, whether it is guilty o[r] not guilty, each juror must agree with the verdict. In other words,

13

your verdicts must be unanimous."  (Resp't's App. at 1219-20 (Trial Tr. at 1202-03).)

Robertson has provided no clearly established federal law in support of his position that it is a denial of due process to instruct a jury before it begins deliberations that its verdict must be unanimous.  The Eighth Circuit endorsed a nearly identical instruction in *United States v. Arpan*, 887 F.2d 873, 874-75 (8th Cir. 1989) (finding "a correct statement of the law" the instruction that "[i]n order to return a verdict, it is necessary that each juror agree thereto.  Your verdict must be unanimous.").  To the extent Robertson suggests the jury should have been advised of a third option—to make no decision—that argument was rejected in *Arpan*, 887 F.2d at 876.  To the extent Robertson contends the jury should have been given an *Allen* charge,[2] the argument fails because the jury was not deadlocked.

### D.    Evidentiary Rulings and Due Process

Robertson contends that several evidentiary rulings by the trial court denied him a fair trial.  On habeas review, this Court may not "reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The Court's review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  Accordingly, this the Court does not consider whether the state trial court erred in admitting or excluding evidence under Minnesota state law, but

---

[2] "An *Allen*-charge is a supplemental jury instruction that advises deadlocked jurors to reconsider their positions." *United States v. Glauning*, 211 F.3d 1085, 1086 n.2 (8th Cir. 2000) (*citing Allen v. United States*, 164 U.S. 492 (1896)).

14

only whether the admission or exclusion of evidence violated due process or some other clearly established federal law.

### 1.    Robertson's Recorded Statement

Robertson first challenges the trial court's ruling that he could not introduce the entirety of a recorded statement he made to the police. Robertson sought to introduce the statement after the interrogating officer testified about portions of the statement at trial. Robertson argued to the Minnesota Supreme Court that the trial court violated Minnesota Rule of Evidence 106.[3] *Robertson*, 884 N.W.2d at 872. The Minnesota Supreme Court held that Robertson did not meet his burden to show that the trial court abused its discretion in excluding the entire statement, pursuant to *State v. Bauer*, 598 N.W.2d 352, 368 (Minn. 1999).

A challenge to an evidentiary ruling by a state court based on state law is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). The Court may consider the ruling only to the extent that it deprived Robertson of a fair trial in violation of due process. Robertson has not identified any clearly established federal law establishing that

---

[3] Minnesota Rule of Evidence 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

his statement should have been admitted in its entirety. Moreover, as the Minnesota Supreme Court remarked, admitting his entire statement would have permitted him to testify "in an indirect way" without the possibility for cross-examination. *See Robertson*, 884 N.W.2d at 873. Moreover, on cross-examination, defense counsel elicited testimony from the interrogating officer that Robertson had denied any involvement in the shooting, which was the same evidence Robertson sought to admit through the recorded statement. *Id.* at 874.

The Court concludes that the trial court did not violate Robertson's due process rights by denying his request to admit his entire recorded statement into evidence.

### 2. Exclusion of Eyewitness Statement

Robertson next faults the trial court for excluding a statement from eyewitness L.S., who died before the trial. The court sustained a hearsay objection to defense counsel's question to a police investigator asking whether L.S. had failed to identify Robertson as the shooter. *Robertson*, 884 N.W.2d at 872. The Minnesota Supreme Court addressed the issue and held that the statement was hearsay under Minnesota Rule of Evidence 801(c). *Id.* at 875.

This Court will not examine the propriety of the state court's evidentiary ruling but will consider whether the ruling violated due process. The Minnesota Supreme Court agreed that L.S.'s nonverbal out-of-court statement was indeed hearsay because it was offered for the truth of the matter asserted. *Robertson*, 884 N.W.2d at 875. In addition,

16

the Minnesota Supreme Court determined that the verdict would not have been substantially affected by the evidence because the jury already knew that L.S. had provided only a vague description of the shooter to the police and because of the vast weight of other evidence of Robertson's guilt. *Id.* at 876.

Robertson has not cited any clearly established federal precedent that would support his position that the exclusion of L.S.'s statement violated due process, and the Court concludes that the exclusion of the evidence did not deprive him of a fair trial.

### 3. Sergeant Dunphy's Testimony about Robertson's Facebook Post

Police Sergeant Emily Dunphy testified about the meaning of the following post on Robertson's Facebook page: "Lmfao…niggas must forgot solo was on they ass!!!!free my hittas." (Resp't's App. at 658 (Trial Tr. at 641).) She testified that the term "Lmfao" means "laughing my fucking ass off," that the word "hittas" means "friends," that the phrase "free my hittas" means "Free my friends who have been charged with a crime," and that "Solo" was Robertson's street name. (*Id.* at 645, 658.) Sergeant Dunphy also testified that as an officer assigned to the Intelligence Unit of the Minneapolis Police Department, her role was primarily to gather information about gang members from interviews and social media sites. (*Id.* at 641-43.) Through her training and experience, she has become very familiar with the language and vernacular used by gang members. (*Id.* at 643.)

Robertson characterizes the above testimony as unfairly prejudicial because

17

Sergeant Dunphy was not qualified as an expert. The Court disagrees. Robertson does not cite any clearly established law in support of his argument that Sergeant Dunphy's testimony was improper expert testimony. Furthermore, the Eighth Circuit has recognized that a testifying officer's reliability may be established through personal knowledge and experience. *See United States v. Peebles*, 883 F.3d 1062, 1069-70 (8th Cir. 2018); *United States v. Beltran-Arce*, 415 F.3d 949, 952 (8th Cir. 2005). Sergeant Dunphy testified that she is very familiar with the language and vernacular used by gang members through her training and experience.

Robertson cites to *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988),[4] for the proposition that the trial court should have admitted his entire Facebook post, not just the portion quoted above. (Pet'r's Mem. Supp. at 26 n.7.) But Robertson did not seek to admit any other part of the Facebook post in connection with Sergeant Dunphy's testimony or at any other point during the trial. (*See* Resp't's App. at 625-31, 717-29 (Trial Tr. at 608-14, 700-12).) In addition, Robertson's attorney was permitted to question Sergeant Dunphy fully about the content of the post at issue, as well as other posts about which she testified.

In sum, Sergeant Dunphy's testimony about Robertson's Facebook posts was not

---

[4] *Beech Aircraft* addressed, in relevant part, the "rule of completeness," described by Wigmore as: "[T]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." 488 U.S. at 171 (quoting 7 J. Wigmore, *Evidence in Trials at Common Law* § 2113, at 653 (J. Chadbourn rev. 1978).

unfairly prejudicial and did not deprive Robertson of due process.

### 4.    Authentication of M.S.'s Facebook Posts

Robertson argues that the trial court erred by admitting into evidence Facebook communications Robertson allegedly had with M.S., because M.S.'s side of the communications were not authenticated and the communications were improper character evidence.  (Pet'r's Mem. at 27.)

The Court finds, for several reasons, that the admission of the communications did not violate Robertson's due process rights.  First, Robertson acknowledged to the police not long after the shooting that the communications were between him and M.S.  *See Robertson*, 884 N.W.2d at 869.  Second, Officer Dunphy testified that she was able to ascertain the identity of M.S. on Facebook through her training, experience, and familiarity with the investigation.  (Resp't's App. at 665-66 (Trial Tr. at 648-49).)  Third, it is apparent from the content of the messages, particularly that related to the April robbery of M.S., that the communications were between M.S. and Robertson.  (Resp't's App. at 667-75 (Trial Tr. at 650-58).)

As to Robertson's assertion that the communications were admitted as improper character evidence, he has not shown that the evidence was admitted contrary to or inconsistent with clearly established federal law.  Moreover, the communications were not used for the purpose of showing a propensity to act in a certain way; they were admitted for the purpose of showing motive, which is allowed under Federal Rule of

Evidence 404(b), the federal counterpart of Minnesota Rule of Evidence 404(a).

### 5.    Evidence Regarding the Dissemination of Court Documents

Finally, Robertson contends the trial court improperly allowed evidence that he disseminated grand jury transcripts while he was detained in the Hennepin County jail before trial.  The Minnesota Supreme Court summarized the circumstances as follows:

> After the grand jury indicted Robertson for first-degree premeditated murder, Robertson released annotated pages from the grand jury transcript to a friend who visited him in jail.  The friend then gave the pages to one of Robertson's gang associates, who uploaded copies of the pages to Facebook.  The transcript referred to the witnesses who were present for the sale of the murder weapon and who testified against Robertson only by letter designation.  Nevertheless, Robertson was able to correctly list in the transcript margins the street names of those witnesses. . . .  The individual who posted the transcript pages said that he did so because he wanted to publicize the identities of the witnesses who were testifying against Robertson.

*Robertson*, 884 N.W.2d at 870.  The trial court allowed the evidence as indicative of Robertson's intent to discourage or intimidate witnesses, as evidence of consciousness of guilt, and as proof that Robertson was present at the scene of the shooting.  (Resp't's App. at 1305-06, 1310 (Mot. Hr'g Tr. at 10-11, 15).)

Robertson has not shown that the admission of the evidence violated or was inconsistent with any clearly established federal law.  In allowing the evidence, the trial court reasoned that the dissemination of the grand jury transcripts could have discouraged or intimidated witnesses if Robertson actually intended that effect, and the way in which Robertson provided the grand jury transcripts to his friend suggested such an intent.

20

(Resp't's App. at 1305-06 (Mot. Hr'g Tr. at 10-11).)  The trial court's reasoning that the

testimony was more probative than prejudicial did not violate due process.

### 6. The Alleged Evidentiary Errors, Considered in Combination, Did Not Deprive Robertson of Due Process

The Court has considered each of the alleged evidentiary errors in turn and

determined that none violated due process.  The Court has also considered the combined

effect of the alleged errors and reaches the same result.  Robertson has not shown that the

totality of "the alleged improprieties were 'so egregious that they fatally infected the

proceedings and rendered his entire trial fundamentally unfair.'"  *Hamilton v. Nix*,

809 F.2d 463, 470 (8th Cir. 1987) (quoting *Moore v. Wyrick*, 760 F.2d 884, 886 (8th Cir.

1985)).

### E. Identification Procedure

Robertson next submits he was denied due process because of an unduly

suggestive identification procedure.  A few days after the shooting, police asked S.L. to

view a photo lineup of six men and to identify the person she saw walk past her car just

before and after the shooting.  *Robertson*, 884 N.W.2d at 869.  S.L. isolated two photos

from the group: one was Robertson, and the other was an individual referred to as R.E.

*Id.*  S.L. ultimately identified R.E. as the shooter, but she appeared uncertain about her

decision.  *Id.*  Robertson now argues that evidence of S.L.'s selection of R.E. improperly

suggested to the jury that Robertson was the shooter because the jury was also informed

that R.E. was in custody at the time of the shooting, which left only Robertson as the

21

person potentially identified by S.L.  The Minnesota Supreme Court summarily concluded this argument lacked merit.

Robertson has cited no Supreme Court precedent confronting similar facts and reaching a contrary result or setting forth a legal principle that was misapplied by the Minnesota Supreme Court.  The two Supreme Court cases cited by Robertson, *Perry v. New Hampshire*, 565 U.S. 228 (2012), and *United States v. Wade*, 388 U.S. 218 (1967), are inapposite.  In *Perry*, the Court held due process "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."  565 U.S. at 248.  In *Wade*, the Court addressed, *inter alia*, whether a post-indictment lineup was a critical stage of the prosecution such that the defendant had the right to have counsel present and whether, if that identification was made without counsel, a subsequent courtroom identification should have been excluded.  388 U.S. at 236-37, 242.

Furthermore, evidence that S.L. identified an individual other than Robertson arguably would have been helpful to his defense, and, in fact, his attorney made just that point in his closing argument.  (Resp't's App. at 1169 (Trial Tr. at 1152).)  In addition, the jury was informed of all of the circumstances surrounding the photo lineup, including S.L.'s uncertainty and ultimate selection of another individual.

Finally, it is significant that Robertson does not challenge the nature of the

22

identification procedure itself as suggestive. He does not argue, for example, that the police arranged the photos in a suggestive way or engaged in other suggestive conduct. Rather, he takes issue with the State's use of the results at trial and the State's introduction of evidence that the individual identified by S.L. was actually incarcerated on the date of the shooting, which suggested that the only other individual strongly considered by S.L.—Robertson—had to be the shooter. But this trial tactic did not render the pretrial identification procedure suggestive.

### F.    Prosecutorial Misconduct

Robertson argues the prosecutor committed misconduct in violation of his due process rights in several ways.

#### 1.    Statements Made During Closing Argument

Robertson first contends that the prosecutor misstated evidence in the record during the closing argument. An improper comment by a prosecutor violates the Constitution only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). To meet his burden, Robertson must show "a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety the verdict probably would have been different." *See Hamilton v. Nix*, 809 F.2d 463, 470 (8th Cir. 1987).

The first statement at issue is: "They interview Parker that night. What don't they

23

know about the gun yet?  They don't know that that's the murder weapon for about a week later, right?"  (Resp't's App. at 1207 (Trial Tr. at 1190).)  In response to defense counsel's objection, the prosecutor explained that the forensic scientist did not test-fire the gun until a week after the Parker interview.  This is consistent with the evidence at trial.  (*See* Resp't's App. at 769, 970, 1207 (Trial Tr. at 752, 953, 1190).)  Thus, the prosecutor did not misstate the evidence.

The second statement at issue is the prosecutor's statement that "[S.L.] did not say, by the way, that she did not see tattoos," when, in fact, S.L. did testify that she had not seen any tattoos on the individual who walked by her car.[5]  (Resp't's App. at 367, 1209 (Trial Tr. at 350, 1192).)  Defense counsel objected, and the trial court instructed jurors to rely on their own memories about what was said.  (Resp't's App. at 1209 (Trial Tr. at 1192).)  The trial court also instructed the jury on two other occasions that the attorneys' statements were not evidence.  (Resp't's App. at 25, 1117 (Trial Tr. at 8, 1100).)

In light of the court's instructions to the jury, and the relative weight of the evidence of the tattoos in comparison to the other identifying information provided by S.L. (particularly the distinctive Timberland boots), the Court cannot conclude that the prosecutor's misstatement had a substantial and injurious effect on the verdict.

### 2. Vouching for Witness Credibility

Robertson next argues the prosecutor committed misconduct by vouching for

---

[5]  Robertson apparently has tattoos on his neck and arm.

S.L.'s credibility. He challenges specifically the prosecutor's statement in his rebuttal argument that S.L. "is not a liar." (Resp't's App. at 1208 (Trial Tr. at 1191).)

"Improper vouching may occur when the government: (1) refers to facts outside the record or implies that the veracity of a witness is supported by outside facts that are unavailable to the jury; (2) implies a guarantee of truthfulness; or (3) expresses a personal opinion about the credibility of a witness." *United States v. Benitez-Meraz*, 161 F.3d 1163, 1167 (8th Cir. 1998). Where a prosecution witness is attacked, however, the prosecutor "is entitled to make a fair response and rebuttal." *United States v. Lee*, 743 F.2d 1240, 1253 (8th Cir. 1984); *Fisher v. Campbell*, No. 17-1212, 2017 WL 3754249, at *2 (6th Cir. Aug. 2, 2017) (finding the prosecutor's statement that a witness "is not a liar" a proper response to defense counsel's suggestion in closing that the witness had fabricated his story). Here, the prosecutor's comment about S.L. was made in rebuttal to defense counsel's attack on S.L.'s credibility. (*See* Resp't's App. at 1177-78, 1208 (Trial Tr. at 1160-61, 1191).) In fact, the prosecutor specifically referred to defense counsel by name in rehabilitating S.L.'s credibility during rebuttal. Consequently, the prosecutor's comment was not improper.

### 3. Correcting False Testimony

Robertson's final prosecutorial misconduct claim is that the prosecutor failed to correct alleged perjury, specifically: (1) Sergeant Dunphy's testimony to the grand jury and at trial that Robertson posted about the shooting of Kevin Braziel on Facebook on

25

June 25, 2014; and (2) Sergeant Dunphy's testimony that M.S. was robbed at Robertson's home.  (Tr. 687, 193).

"To prove prosecutorial use of false testimony, a defendant must show that: (1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." *United States v. Funchess*, 422 F.3d 698, 701 (8th Cir. 2005).  Perjury requires not only false testimony but also the intent to provide such testimony.  *United States v. Espinoza*, 684 F.3d 766, 780 (8th Cir. 2012) (quoting *United States v. Collier*, 527 F.3d 695, 702 (8th Cir. 2008)).

Robertson's claim fails on all scores.  He has not established that the testimony was false, that Officer Dunphy intended to provide false testimony, that the prosecutor used perjured testimony, that the prosecutor knew or should have known of the perjury, or that the testimony had an effect on the jury's verdict.  Consequently, he is not entitled to habeas relief on this claim.

### G.    Sufficiency of the Evidence

Robertson submits he was denied due process because the evidence against him was not sufficient to sustain a guilty verdict on the charge of murder in the first degree. He raised this argument to the Minnesota Supreme Court, which determined there was sufficient evidence to sustain the conviction.  *Robertson*, 884 N.W.2d at 872.  The court placed particular emphasis on S.L's description of the shooter as wearing distinctive,

autumn-colored Timberland boots; the seizure of a pair of autumn-colored Timberland boots from Robertson's home; Robertson's statement during a jailhouse phone call that the police had mentioned *his* shoes and *his* description in the criminal complaint; Robertson's argument with M.S. and motive to silence M.S. about the robbery; Robertson's sale of the murder weapon days after the shooting; and Robertson's statement to the buyer that he knew the gun worked because he had just shot it. *Id.* at 871-82.

The question for the Court on federal habeas review "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Robertson has failed to meet this high bar. Much of his argument is founded on speculation (*i.e.*, alternative perpetrators) and evidence that was not introduced at trial (*i.e.*, that the boots seized from his residence were actually the ones described by S.L.). On the other hand, the evidence recounted by the Minnesota Supreme Court and other evidence adduced at trial was sufficient to sustain a conviction of murder in the first degree.

### H.  No Certificate of Appealability Is Warranted

Before appealing a final ruling on a federal habeas petition, a state prisoner must be granted a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1). The Court cannot grant such a certificate unless "the applicant has

made a substantial showing of the denial of a constitutional right."  28 U.S.C.

§ 2253(c)(2).  The applicant must show that the issues to be raised on appeal are

"debatable among reasonable jurists," that different courts "could resolve the issues

differently," or that the issues otherwise "deserve further proceedings."  *Flieger v. Delo*,

16 F.3d 878, 882-83 (8th Cir. 1994).

This Court finds it unlikely that any other court, including the Eighth Circuit Court

of Appeals, would decide Robertson's claims any differently than recommended here.

Robertson has not identified, and the Court cannot independently discern, anything novel,

noteworthy, or worrisome about this case that warrants appellate review.  The Court

therefore recommends that Robertson not be granted a COA.

Accordingly, based on the foregoing, and on all of the files, records, and

proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Marlon Rashaad Robertson's Petition under 28 U.S.C. § 2254 for Writ of Habeas

   Corpus by a Person in State Custody [Doc. No. 1] be **DENIED**;

2. This action be **DISMISSED**; and

3. No certificate of appealability be issued.

Dated: July 6, 2018                          s/ *Hildy Bowbeer*
                                         HILDY BOWBEER
                                         United States Magistrate Judge

**NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).